UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| JEANINE MESSLER, | ) | |
|     Plaintiff | ) | |
|       v. | ) | C.A. No. 10-cv-30156-MAP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER, SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
|     Defendant | ) | |


MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER
(Dkt. Nos. 12 & 15)

September 19, 2011

PONSOR, S.J.

## I. INTRODUCTION

This action seeks review of a final decision of the
Commissioner of Social Security ("Commissioner") denying
Plaintiff's applications for Social Security disability
insurance benefits.  Plaintiff applied for benefits on
December 12, 2007, alleging disability due to Crohn's
Disease and back pain since January 1, 2000.  (A.R. 199.)
Her claim was denied initially and upon reconsideration.
(A.R. 10.)  Plaintiff requested an administrative hearing,

which was held on February 3, 2010, before an administrative
law judge ("ALJ").  At the hearing, Plaintiff amended the
alleged onset of disability to August 13, 2007.  (A.R. 10.)
On March 5, 2010, the ALJ issued her decision, finding that
Plaintiff had not been disabled within the meaning of the
Social Security Act, 42 U.S.C. § 1382c, since her date of
application.  (A.R. 10-20.)  On June 9, 2010, the Decision
Review Board issued a notice that it had failed to review
the claim during the allotted ninety-day period, thus
rendering the ALJ's decision final.

Plaintiff has filed a motion for judgment on the
pleadings (Dkt. No. 12), and Defendant has moved for an
order affirming the decision of the Commissioner (Dkt. No.
15).  For the reasons stated below, the court will allow
Defendant's motion and deny Plaintiff's motion.

## II. FACTS

### A.  Plaintiff's Personal and Work Experience.

Plaintiff, who was forty-four years old at the time of
the hearing, lives with her daughter and her granddaughter.
Plaintiff graduated from highschool, and beginning in 1990,
worked as a Certified Nursing Assistant ("CNA"), primarily
in the mental health field.  (A.R. 35.)

Plaintiff was diagnosed with Crohn's Disease in 2000

and a portion of her bowel was removed at that time.[1]  (A.R. 39.)  Plaintiff stated that she was on a medication regimen for some time that controlled the disease, and she also became familiar with what triggered the onset of its symptoms.  (A.R. 40.)

In 2003, Plaintiff lost her job because she was using heroin.  (A.R. 245.)  She entered a methadone program for two years, until 2005, at which time she returned to work as a CNA.  Plaintiff stopped working entirely after she had neck surgery in 2007, followed by hand surgery.  She explained that she "would not put myself in that position to care for someone that was relying on me to take care of them."  (A.R. 36.)  She further stated that "as far as getting another job doing something else, my hands are like my eyes to me.  I can't, I can't.  I just don't feel comfortable."  (A.R. 37.)

B.  Plaintiff's Impairments.

At the hearing, Plaintiff testified that the following impairments rendered her disabled: neck pain, hand pain, carpal tunnel syndrome in both hands, Crohn's Disease, depression, and anxiety.  (A.R. 28-29.)  She testified that her impairments restrict her to sitting and standing for

---

[1] Crohn's Disease is a chronic inflammatory bowel disease that impacts the end of the small intestine, or ileum.  Its symptoms include persistent diarrhea, abdominal pain, fever, and fatigue.  See www.crohnsonline.com.

about fifteen to twenty minutes at a time because she is
"not comfortable" and that she has difficulty reaching
overhead.  (A.R. 47.)

    1.  <u>Neck Pain</u>.

    Plaintiff testified that on August 13, 2007, she "went
completely numb from [her] neck down."  (A.R. 30.)  Three
days later, after an MRI revealed "significant disk
herniations," Dr. Dennis Oh performed a cervical fusion.
(A.R. 267, 271.)  By February 26, 2008, Dr. Oh reported that
Plaintiff was "free of the radiculopathic pain" and that
"[f]rom my perspective, she does not need routine followup
anymore."  (A.R. 356.)  Nevertheless, as of the time of the
hearing, Plaintiff stated that she is limited to sitting and
standing for about fifteen to twenty minutes at a time
because she is "not comfortable" and that she has difficulty
reaching overhead.  (A.R. 47.)  She further stated that she
takes sleep medication every night due to the pain in her
neck.  (A.R. 44.)

    2.  <u>Plaintiff's Hands</u>.

    a. <u>Plaintiff's Testimony</u>.

    While Plaintiff was recovering from her neck surgery,
she fell forward, landing on her hands, and she began to
experience "numbness, tingling, no strength, no grip."
(A.R. 30.)  In 2008, she underwent surgery in her right

hand.  Soon after, her left hand began to hurt, and she
scheduled surgery for this hand for March 2010.  (A.R. 33.)

Because of the pain, numbness, and weakness in her
hands, Plaintiff testified that she is unable to open jars,
button buttons, or use a zipper.  (A.R. 44-45.)  She stated
that she can lift a cup of coffee but cannot hold it steady
and is unable to lift a gallon of milk.  (A.R. 46.)  She
cannot vacuum or mop, and drops dishes when she tries to
wash them.  (A.R. 51.)  Plaintiff is able to drive but
cannot shop alone because she cannot lift the groceries.
(A.R. 246.)  She cannot read because she is unable to hold a
book: "the fingers start to go numb."  (A.R. 52.)

In January 2008, prior to her right hand surgery,
Plaintiff completed a pain questionnaire in which she
described the pain as constant.  (A.R. 207.)  She reported
that she took morphine every two hours, which relieved the
pain and enabled her to perform daily activities such as
brushing her hair and tying her shoes.  (A.R. 207, 218.)  At
the hearing, Plaintiff testified that to combat the pain in
her hands, she wears braces at night (A.R. 45) and takes
Suboxone, which "help[s] a lot."  (A.R. 32.)

   b. Medical Evidence.

On July 3, 2007, Plaintiff presented to Dr. Sandyha
Kommana with "pain and weakness radiating in posterior arm"
and "with clearly weak grip."  (A.R. 257.)  He prescribed

5

oxycodone and ordered an MRI, which showed both her right
and left hands as normal.  (A.R. 265-66.)

On July 12, 2007, Plaintiff returned to Dr. Kommana
with back pain.  (A.R. 255.)  He referred her to a
neurosurgeon and prescribed methadone for pain management,
noting in his report that "it is long acting and cheaper."
(A.R. 255.)

On July 23, 2007, Plaintiff was seen again by Dr.
Kommana, who reported that he refilled her methadone
prescription.  (A.R. 254.)  One week later, on August 1,
2007, Dr. Kommana noted that Plaintiff was requesting a
methadone refill.  (A.R. 253.)

On September 7, 2007, when Plaintiff presented with
"thumb pain," Dr. Kommana placed an asterisk beside the
following notation in his report: "no indication for further
narcotics/valium!"  (A.R. 252.)

On September 10, 2007, Dr. Kommana wrote, "Explained
[to patient] that chronic narcotic use causes dependence."
(A.R. 249.)

On November 26, 2007, Dr. Kommana noted that Plaintiff
had returned with wrist pain.  He refilled her painkiller
prescription and "told pt. that would not give any further
refills."  (A.R. 327.)

On January 7, 2008, Dr. Kommana reported that Plaintiff
stated that "she has been using suboxone (bought on the

streets) for pain and it helps!"  (A.R. 320.)  He wrote on
his medical report, "the street use of suboxone is sign of
impulsiveness and untrustworthiness re: narcotics.  For now,
small supply of oxycontin can be given."  (A.R. 325.)  Dr.
Kommana referred Plaintiff to a rheumatologist for steroid
injections.

On January 23, 2008, rheumatologist Dr. Antonio
Valentin of the Arthritis Treatment Center diagnosed
Plaintiff with bilateral tendonitis, or de Quervain
tenosynovitis, which causes inflammation of the tendons on
the thumb-side of the wrist, and gave her steroid injections
in both hands.  (A.R. 310.)  He further recommended physical
therapy.

On January 24, 2008, Plaintiff returned to Dr. Kommana
"requesting more morphine."  Dr. Kommana reported that
Plaintiff "has 3 oxycontin left, taking twice a day."  (A.R.
321.)

On February 11, 2008, Plaintiff reported to Dr. Kommana
that all pain in both wrists reappeared within three hours
of the injections.  (A.R. 313.)  She requested refills on
her prescriptions, and Dr. Kommana explained to Plaintiff
"that narcotics are not a long term option here" and gave
her ten morphine pills "to taper [Plaintiff] off narcotics."
(A.R. 314.)

In her visits to the Arthritis Treatment Center in

February and March 2008, Plaintiff stated that her worst
pain was in her wrists, particularly her right wrist, with
secondary pain in her neck and shoulder.  (A.R. 339.)  She
rated the pain at between eight and ten on a scale of ten
and indicated that she had trouble sleeping due to the pain.
(A.R. 339, 342.)

On October 7, 2008, Dr. Steven Wenner of New England
Orthopedic Surgeons performed surgery on Plaintiff's right
wrist.  (A.R. 373.)  In his initial surgical report, he
indicated that he had explained to Plaintiff that the
surgery could only alleviate pain in one part of her wrist
because, in much of the wrist area that she identified as
painful, he had found nothing "abnormal."  (A.R. 380.)  He
further noted that her complaints of numbness and tingling
were "unsubstantiated."  (A.R. 380.)

After the surgery, Dr. Wenner found Plaintiff's right
hand to have healed by January 29, 2009, but noted that
Plaintiff continued to complain of pain in her left forearm.
(A.R. 370.)  Upon examination, he found full movement in her
left elbow, forearm, wrist, and fingers and stated that he
had no diagnosis.  (A.R. 370.)  In October 2009, Plaintiff
reported that some of her symptoms were returning to her
right hand, including tingling and pain in her fingers that
lasted from a few seconds to a few minutes, three or four
times each day.  (A.R. 687.)

8

On January 10, 2010, Plaintiff returned to Dr. Wenner with complaints of pain in her left hand.  He diagnosed her with carpal tunnel syndrome and recommended surgery.  (A.R. 667.)  His surgical notes state, "I do not intend to give [Plaintiff] pain medication at the time of surgery because of this previous addiction problem."  (A.R. 668.)

        3.   Crohn's Disease.

At the hearing, Plaintiff stated that she was unable to work due to the unpredictable nature of Crohn's Disease, noting that some days she was unable to leave the room: "it's bedroom or it's the bathroom."  (A.R. 38.)  Because of the Crohn's Disease, Plaintiff testified that she goes to the bathroom on a "good day" five or six times, and on a "bad day," at least ten.  (A.R. 48.)  She spends approximately four minutes in the bathroom at each visit. When the disease flares up, she goes to the emergency room. Her most recent flare-up was one year prior to the hearing in February 2009.  (A.R. 48.)

A January 2010 medical report from Baystate High Street Health Center described Plaintiff's Crohn's Disease as asymptomatic.  (A.R. 687.)

        4.   Mental Impairments.

        a. Plaintiff's Testimony.

With respect to her mental impairments, Plaintiff testified that she sees a therapist weekly and a

psychiatrist every two months, who prescribes medication for her depression and her difficulty sleeping.  The medications make her "feel like I'm a different person. . . . My thoughts are in my head but I can't get them out of my mouth."  (A.R. 40.)  The ALJ questioned Plaintiff about whether the medication or the alleged impairment caused this effect, and Plaintiff stated, "[i]t's just a combination of everything."  (A.R. 40.)  Plaintiff testified that she does not sleep well because of her pain and her anxiety, even with sleep medication.  She wakes up every morning feeling "[b]lah."  (A.R. 50.)

Plaintiff testified that her anxiety is triggered by people and crowds, and so she avoids places like the mall and grocery stores.  (A.R. 50.)  When she begins feeling anxious, she calms herself by taking deep breaths and removing herself from the situation.  (A.R. 51.)

Plaintiff stated that she has more "bad days" than "good days" on an average week.  (A.R. 53.)  On her "bad days," she does not get out of bed and "feel[s] like a lump on a log."  (A.R. 53.)  Plaintiff testified that she has problems focusing, though she is able to watch television. (A.R. 52.)  She has trouble remembering dates and phone numbers.  For example, she stated that she must write down the time and date of appointments in order to remember them. (A.R. 52.)

b. <u>Medical Evidence</u>.

From December 2008 through August 2009, Plaintiff
received counseling at Behavioral Health Network, where she
was diagnosed with adjustment disorder with mixed anxiety
and depressed mood and opioid dependence.  (A.R. 399.)
Plaintiff stated that her reason for attending counseling
was that she feels "stuck."  (A.R. 408.)  The goals
identified for Plaintiff included maintaining abstinence
from opiates, discussing triggers for drug use, reducing
anxiety, and identifying the source of her depressed mood.
(A.R. 402.)  The records indicate that Plaintiff was
attending a methadone clinic to assist her in weaning off a
percocet addiction, but that she would have to "do a
methadone detox soon" because "her doctors wanted to
prescribe suboxine for her pain."  (A.R. 402.)

Plaintiff reported to clinician Paul Haley that she was
unable to work due to "a nerve problem that leaves her in a
lot of pain and restricts the movement in her hands," and
that not working is affecting her mood.  (A.R. 407-08.)
Plaintiff's treatment notes primarily concern her drug use
and perceived inability to work.  Mr. Haley noted that
Plaintiff had recently received a prescription for oxycontin
but that "it might be a good idea to get in touch with the
prescribing doctor re: the prescription . . . as she may be
demonstrating med seeking behavior."  (A.R. 410.)

In December 2009, Plaintiff returned to Behavioral Health Network for "medication management." (A.R. 671.) The notes indicate that she was "dealing with a lot of stress at home and is also worried [about] an approaching operation on her hand." (A.R. 672.) The report concluded, "She is pleasant but wanting further relief from anxiety, if possible." (A.R. 672.)

In January 2010, Plaintiff's mental condition was noted by her primary care physician as "stable." (A.R. 689.)

C.   <u>Medical Evaluations and RFC Assessments</u>.

    1.   <u>Psychiatric Evaluations</u>.

    a. <u>Dr. Victor Carbone</u>.

Plaintiff was examined for a disability evaluation on November 15, 2007, by Dr. Victor Carbone, who found that she suffered from "situational depression regarding her daughter [and] also difficulty coping with both the diagnosis of Crohn Disease and subsequently her back problems." (A.R. 247.)  He determined that she would benefit from counseling "in order to sort out what she believes she is capable of doing at the present time." (A.R. 247.)

    b. <u>Dr. Lawrence Langer</u>.

On January 16, 2008, Dr. Lawrence Langer conducted a review of Plaintiff's psychiatric records and determined that she suffered from depressive disorder that was "[n]ot severe." (A.R. 288, 291.)  He found her degree of

limitation in all areas of daily living, social functioning, and ability to maintain concentration to be "mild."  (A.R. 298.)  His ultimate conclusion was that Plaintiff "has a mild depression that does not limit her function.  No severe impairments."  (A.R. 300.)

  2.  <u>Physical Evaluations</u>.

  a. <u>Dr. Antiles</u>.

Plaintiff was examined for a disability evaluation by Dr. Samuel Antiles on November 8, 2007, who found that "[s]he had diminished grip strength but no other neurological abnormality."  (A.R. 243.)

  b. <u>Dr. Girgis</u>.

On January 16, 2008, Dr. Romany Hakeem Girgis conducted a review of Plaintiff's medical records to assess her physical Residual Functioning Capacity ("RFC").  Dr. Girgis, noting that Plaintiff's primary impairment was "tenderness at the base of her thumb joints," determined that Plaintiff was most limited by her obesity, which rendered her capable of only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  (A.R. 304.)  Dr. Girgis limited Plaintiff's hand movements to occasional grasping, twisting, and turning with generally limited reaching and handling.  (A.R. 305.)  Finally, Dr. Girgis found Plaintiff to be credible.  (A.R. 307.)

  c. <u>Dr. Clark</u>.

On September 3, 2008, Dr. Francis Clark completed a disability evaluation regarding only Plaintiff's orthopedic impairments.  He noted that neither x-rays nor physical examination supported Plaintiff's allegations of arthritis in her hands and that the tenosynovitis was a temporary condition not expected to last more than one year.  (A.R. 329.)  Given this assessment, Dr. Clark determined that Plaintiff could lift and carry up to ten pounds frequently and up to twenty pounds occasionally, and could sit, stand, and walk for two hours without interruption and up to six hours in each work day.  (A.R. 330-31.)  He further concluded that with both hands, she could frequently handle, finger, feel, push, and pull, and occasionally reach overhead and in other directions.  (A.R. 332.)

E.   The ALJ's Findings.

The Social Security Administration's disability determination is subject to a five-step process under 20 C.F.R. § 404.1520.  At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her application date of August 13, 2007.  (A.R. 9.) At Step Two, the ALJ determined that Plaintiff had the following severe medical impairments: degenerative disc disease and Crohn's Disease.  (Id.)  At Step Three, the ALJ found that Plaintiff's impairments did not medically equal

14

the criteria of the listed impairments in 20 C.F.R. 404,
Subpart P, App. 1.  (Id.)  At Step Four, the ALJ determined
that Plaintiff had the RFC to perform "sedentary work,"
including lifting ten pounds, standing and walking two hours
and sitting six hours during an eight-hour workday, and

> no more than frequent stooping, balancing and
> kneeling, no more than occasional crouching,
> crawling or climbing of ramps and stairs, would
> never be able to climb ladders, ropes, or
> scaffolds, would be limited to no more than
> frequent handling, fingering and feeling, no more
> than occasional overhead reaching and would need
> to avoid extreme temperature changes, heavy
> machinery and driving.

(A.R. 14.)  Finally, at Step Five, the ALJ found that
Plaintiff was unable to perform any past relevant work but
could perform the requirements of such representative jobs
as information clerk, receptionist, and surveillance
monitor.  (A.R. 19.)

### III. DISCUSSION

Plaintiff appeals from the ALJ's finding that she is
not disabled on three grounds.  First, she argues that the
ALJ failed to consider her depression and her hand pain as
severe limitations.  Second, she argues that at Step Five,
the ALJ improperly relied on a "shorthand" hypothetical in
finding that Plaintiff was capable of performing certain

occupations.   Third, she contends that the ALJ failed to include all of her impairments in her hypothetical and RFC assessment.   The court will address each of these arguments in turn.

A.   <u>Standard of Review</u>.

Judicial review of a final decision of the Commissioner is limited to whether substantial evidence supports the Commissioner's decision, and whether the Commissioner applied the correct legal standards.   <u>Seavey v. Barnhart</u>, 276 F.3d 1, 9 (1st Cir. 2001).   The responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the administrative law judge.   <u>See</u> <u>id.</u> at 10.   The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).   Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion."   <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).   Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."   <u>Rodriguez v. Sec'y of</u>

Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

This is true "even if the record arguably could justify a

different conclusion." Rodriguez Pagan v. Sec'y of Health &

Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B.   Plaintiff's Severe Impairments.

Plaintiff argues that the ALJ failed to recognize her

depression and upper extremity pain as severe impairments.

To be severe, an impairment must "significantly limit

[Plaintiff's] physical or mental ability to do basic work

activities." 20 C.F.R. § 416.920(c). Plaintiff's claims

are not supported by the evidence.

1.   Evidence of Depression.

Pointing to her December 2009 diagnosis of "major

depressive disorder, recurrent, moderate," Plaintiff argues

that the ALJ's failure to consider her depression as severe

was an error of law. (A.R. 671.) However, the ALJ properly

determined that Plaintiff's depressive disorder was not

severe as the record contained no evidence that it limited

Plaintiff's ability to perform any activities.

With respect to the evidence available to the ALJ,

Plaintiff reasonably suggests that the reports of Drs.

Carbone and Langer should be disregarded as both of them

reviewed Plaintiff's mental health records prior to her
treatment with the Behavioral Health Network.  With those
reports excised, remaining for the ALJ's consideration are
Plaintiff's own statements from the hearing and fewer than
fifteen pages of medical records concerning Plaintiff's
mental health, most of which are dedicated primarily to
discussions of Plaintiff's opioid abuse or recitations of
Plaintiff's descriptions of her mental health.  (A.R. 399-
410, 671-72.)  The sole comment in the record that could be
construed to support Plaintiff's allegation of severe
depression is Mr. Haley's observation that Plaintiff
"presents somewhat overwhelmed with depressed mood, lowered
energy and disruption in sleep," which is "consistent with
Major Depression, recurrent, of moderate intensity."  (A.R.
405.)  However, Mr. Haley attributed Plaintiff's mental
state primarily to "changes in treatment for opiate
dependence."  (A.R. 405.)  This apparently temporary
condition is not of sufficient duration to qualify as
severe.  See 20 C.F.R. § 416.909 (noting that to be severe,
an impairment "is expected to result in death . . . or must
be expected to last for a continuous period of at least 12
months.").

Notwithstanding Plaintiff's testimony that on "bad days," she feels "like a lump on a log," the record is silent as to the impact of Plaintiff's depressive disorder on her ability to function.  (A.R. 53.)  Ultimately, the ALJ observed that Plaintiff cared for her granddaughter every day, was able to drive, and was able to perform most household chores, with restrictions due only to physical and not mental limitations.  She thus reasonably concluded that the record showed that Plaintiff's depressed mood and anxiety caused only mild restrictions in her activities of daily living, her ability to function socially, and her ability to maintain concentration, persistence, and pace. (A.R. 13.)  This conclusion is supported by Mr. Haley's description of her as "pleasant," "cooperative," and "future oriented."  (A.R. 405, 672.)  In sum, the record supports the ALJ's conclusion that Plaintiff's depressive disorder is not severe.

    2.  <u>Evidence of Upper Extremity Pain</u>.

    Plaintiff's argument that the ALJ improperly characterized her upper extremity pain fares no better. Plaintiff has been diagnosed with tendonitis and carpal tunnel syndrome, which at times have resulted in

excruciating pain, ten on a scale of ten, according to Plaintiff.  (A.R. 342.)  However, Plaintiff has undergone various surgeries, with the result that her right hand was most recently found to have "excellent" range of motion (A.R. 371) with only slight tingling and numbness.  (A.R. 687.)

With respect to her left hand, Plaintiff was scheduled for surgery to treat carpal tunnel syndrome one month after her hearing.  The record contains no evidence of the results of this surgery.  However, in January 2009, before this surgery, Dr. Wenner conducted an examination of Plaintiff's left elbow, forearm, wrist, and fingers and determined that she had full range of motion.  (A.R. 370.)  Corroborating this medical determination are the observations of "Field Office personnel," who, the ALJ noted, "observed no problems with [Plaintiff] using her hands."  (A.R. 14.)

In short, there is ample support for the ALJ's conclusion that Plaintiff's hand pain does not render her "incapacitated to the extent alleged in light of the reports from treating and examining sources as well as reflected in her ability to perform a wide range of daily activities." (A.R. 18.)  Accordingly, Plaintiff has not demonstrated, as

she must for a determination that an impairment is severe,
that "the impairment is one which could conceivably keep
[her] from working." McDonald v. Sec'y of Health & Human
Servs., 795 F.2d 1118, 1122 (1st Cir. 1986.). See also SSR
96-7 ("[A]n individual's statement about his or her symptoms
is not in itself enough to establish the existence of a
physical or mental impairment or that the individual is
disabled.").

C.   The ALJ's "Shorthand" Hypothetical Question.

At the hearing, the ALJ posed a hypothetical to the
vocational expert ("VE"), asking for occupations that would
meet the following RFC:

> Light exertion; sit, standing, and walking six
> hours maximum in an eight hour day; frequent push
> pulling. . . . Everything would be frequent except
> for occasional crouching and occasional crawling.
> And no ladders or . . . scaffolds.  But you know
> stairs and things like that of course are fine. .
> . . Manipulative I have only occasional overhead
> reaching.  Everything else is frequent.

(A.R. 55.)  The VE responded with representative occupations
including companion, greeter, and hotel clerk.  The ALJ then
inquired, "how much use is with your hands?  Is the focus of
these jobs like standing and walking?"  (A.R. 57.)  The VE
explained that all of the jobs required some standing and

21

some use of the hands.  For example, the hotel clerk "would
use the hands when they are filling out paperwork,
processing payments, and entering data into a computer" and
the companion "may use their hands working[,] doing some
things around the house."  (A.R. 57.)  After this exchange,
the ALJ posed "hypothetical number two, sedentary, just pure
sedentary . . . no mental limitations."  (A.R. 58.)  The VE
responded that receptionist, information clerk, and
surveillance system monitor satisfied the restrictions of
this RFC.  (A.R. 58.)

Plaintiff contends that "hypothetical number two," upon
which the ALJ relied for her findings in Step Five of the
disability determination, lacks sufficient detail and thus
fails to "correspond to conclusions that are supported by
the outputs from the medical authorities."  Arocho v. Sec'y
of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).
This argument is unpersuasive.  The only fair construction
of the record at this point is that, by positing the second
hypothetical, the ALJ was asking the VE to identify
occupations that included all of Plaintiff's previously
stated restrictions, but with the additional requirement
that the occupations be purely sedentary.  Had the VE

understood the ALJ to be asking for jobs that were solely
sedentary with no other restrictions, he would have listed
numerous jobs requiring frequent fingering and handling,
such as manufacturing, assembling, and sewing.  The VE's
failure to do this makes it obvious that in responding to
the ALJ's question he had all Plaintiff's restrictions in
mind.  There is no merit to Plaintiff's argument.

D.   RFC Assessment.

     Plaintiff's final contention is that the ALJ erred by
not incorporating into her RFC assessment her need for
frequent bathroom breaks, limitations on the use of her
hands, her depression, and her generalized anxiety disorder.
As Plaintiff points out, in assessing a claimant's RFC, the
ALJ is required to consider all "medically determinable
impairments of which [the ALJ is] aware, including . . .
medically determinable impairments that are not 'severe.'"
20 C.F.R. § 404.1545.

     First, Plaintiff incorrectly states that the ALJ did
not consider her hand limitations in her RFC.  In fact, the
ALJ specifically included "no more than frequent handling,
fingering and feeling, no more than occasional overhead
reaching."  (A.R. 14.)  As discussed above, the ALJ properly

found Plaintiff's upper extremity impairments to be not severe, and the limitations that she included in the RFC are supported by the evidence.

With respect to Plaintiff's mental impairments, Plaintiff has not suggested any restrictions that the ALJ should have imposed, and the court has already found that the ALJ did not err in determining that Plaintiff's mental impairments only mildly restricted her ability to perform the activities of daily living.

Finally, Plaintiff argues that the ALJ failed to account for her need for "frequent and unscheduled bathroom breaks five to ten times daily." (Dkt. No. 13, Pl. Mem. in Support of Mot. at 17.) Such a limitation, however, would have contradicted the weight of the evidence. Plaintiff testified that usually she went to the bathroom five or six times each day, but when her Crohn's Disease flares up, the frequency increased to ten times. (A.R. 48.) Notably, Plaintiff did not suggest that a limitation including frequent breaks would preclude the occupations listed. Furthermore, Plaintiff testified that her most recent flare-up was in February 2009 (A.R. 48), and in January 2010, her medical provider found her Crohn's Disease to be

asymptomatic.  (A.R. 687.)

In sum, the court finds that the ALJ properly considered all of Plaintiff's impairments, severe and not severe, in assessing Plaintiff's RFC.

IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion to Reverse or Remand (Dkt. No. 12) is hereby DENIED, and the Commissioner's Motion to Affirm the Decision of the Commissioner (Dkt. No. 15) is hereby ALLOWED.  The clerk will enter judgment for Defendant.  The case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
_____
 MICHAEL A. PONSOR
Senior U. S. District Judge